Counselor excused. We'll turn to our next case, 23-2159, Baca v. Cosper. Mr. Lohmann, when you're ready. Good morning, Your Honors. May it please the Court, I'd like to return five minutes for the vote. My name is Eric Lohmann. I represent the plaintiff appellant in this case, Perla Baca. She's the representative of the estate of Amelia Baca, who was killed by Officer Cosper on April 13, 2022. There are two issues before the Court here, and they are the two prongs of qualified immunity, the qualified immunity analysis. I'm asking the Court to consider them each separately and distinctly. They are separate issues for our purposes. First, I would like to talk about what was clearly established on April 13, 2022. That was the day that Amelia Baca was killed by Officer Cosper. And as of 2019, it was clearly established that an officer violates Fourth Amendment when he ignores a plaintiff's mental state and unreasonably escalates the situation to create the need for deadly force. I take that from the holding of Ceballos v. Husk. That is a 2019 Tenth Circuit decision. And in that case, officers responded to a man who was emotionally distraught, having some kind of mental health episode. He was holding a bat, and the officers approached him aggressively, screaming in his face, escalated the situation to the point where ultimately they shot him, killed him. And Tenth Circuit found in that case that the officers unreasonably escalated, denied qualified immunity to the officer, and found that he unreasonably escalated the situation. For sure, this was clearly established by 2019. Arguably, it was clearly established as early as 2007 in an unreported case from the Tenth Circuit called Hastings. Law is not clearly established by unreported cases. That's black-letter law. So don't worry about that. Well, thank you for that. But for sure, by 2019, it was clearly established. And Ceballos sweeps up Hastings and some other cases. Allen v. Muscogee is another earlier one, as this court got to its holding in Ceballos. But nobody else was endangered in Ceballos, right? Doesn't that distinguish it? No, Your Honor. The wife and the child had left the premises. He's alone in the driveway. Thank you, Your Honor. So respectfully, I would say no. So the video in this case speaks for itself. And what it depicts is Amelia Baca, this frail 75-year-old woman, clearly bewildered, confused. And there is no one else around. She's in a room. I thought that the daughter who had called the police and the granddaughter who had been threatened were barricaded in a bedroom in the house. They may have been somewhere else in the house. Well, that was the report. That's what the officer understood, is it not? I think that's right. But as far as who is in immediate danger, there was no one else. What Officer Cosper is looking at is a living room and a kitchen. There's a hallway off to the side. If there's somebody in the back of the house, they're not in any immediate danger. Officer Cosper is, you know, during different points in the encounter, 10, 12 feet away. Now, when he arrives, when he arrives, it is peaceful and calm and quiet. All of this is depicted on the video because Amelia Baca's daughter and granddaughter had essentially resolved the situation. They were... I wondered that. Are the two women who were with her, as you first see the video of the kitchen area, is that the reporting party and the granddaughter? Or are they still back in the house somewhere? No. That is not who called. That is not who called. Well, wait a minute. That's not who called the police? That's right. I thought it was the daughter who said, we're barricaded in the back bedroom. There were other family members. Okay, so... Oh, well, I'm sorry, but who are the two women who are talking very calmly and peaceably when the officer arrives? Yes. One is Amelia Baca's daughter, and the other is her granddaughter. So it's the very people who had expressed alarm? No. No, so these are different people. Officer Cosper also reports that as he was making his way to the house, he saw two women walking near or walking into the house. And it was those two. So they arrived just before Officer Cosper. They see their mother and grandmother, who had been suffering from dementia for some time, having this episode, you know, having a bit of a freakout. And they calmed her down. And they were hugging her. Everything was calm and quiet when he arrived. He says, police department, please exit the house. And that's when the two women, still calm and quiet, and that's when these two women exit because they were ordered to do so by Officer Cosper. One of them mutters something in Spanish. The other one, the granddaughter, says, please be very careful with her. And I may touch on this later. I think the district court found the fact it should not have on what was the meaning and context of that statement. Please be very careful with her. And then Officer Cosper immediately sees Amelia Bachus standing there and pours gasoline onto the situation. It had been very calm and peaceful when he arrived. And it is that escalation, not just a failure to de-escalate, but it is that escalation that was a, amounts to a fourth amendment violation, as described in Ceballos v. Husk and other cases before and since. Counselor, could I just stop you there and help me understand, in your view, what the officer should have done? Gladly, yes, thank you. I have my timestamp notes in my briefcase. But at something like 13 seconds into the encounter, another officer shows up. Officer Fierro was there, and we had his body cam, too. And so we're able to time exactly what happened when. Officer Cosper knew almost immediately, well, I'll get back to Officer Fierro. Officer Cosper knew almost immediately that this is a woman suffering from mental illness. What he should have done and could have done. How did he know she was suffering from mental illness? Because when the family members, the two family members that walked out of the house and one said, please be very careful with her. That told him that she suffered from mental illness? They did all, just a few seconds later. When they saw his reaction, and this is undisputed, this is in the record. There is a moment in the video where Officer Cosper says, okay, back up. And what is undisputed now is he was saying that in response to being told that she's having a mental issue, she has a mental health issue. And that is something like. I thought I heard that, but when you reported the conversation a moment ago, you just mentioned be careful with her. So there were two things that they said. That's right. As they're shuffling out, she says, please be very careful with her. Officer Cosper starts, draws his weapon, points his weapon at Amelia Baca, starts yelling at her. And that's when they come back and say, no, no, no. And that's when they tell him that she has some mental health issues. When he says, okay, back up, that's him saying, okay, I hear you about the mental illness, but doesn't do anything to change his approach. That's something like T minus 26 seconds into the encounter. I left my notes back at the table. What could he and should he have done, Your Honor? And what's required by the case laws to inquire? What am I dealing with? Who is this person? He can do that while still keeping her in his sights and making sure that there's no one else in any immediate danger. Inquire to who? To the woman who just told him she has mental health issues. He was supposed to have a more extensive conversation with the family members there, is what you're saying? That's right. Well, so was the back up, was that, I mean, he had to get them out of there, didn't he? Or, I mean, how is he supposed to have an extended conversation, I guess is my question, given the situation? Well, again, when he arrived, everything was peaceful and quiet. He could have asked them, what's going on? What am I dealing with here? Because at that moment, nobody was in any danger. Everything was calm. He could have asked them then, what's going on? What's going on here? Instead, he escalated this situation into that frenetic scene that we see on the video. But even then, now it's undisputed at this point in the video that he knows that he's dealing with someone with dementia or some sort of mental health episode. At that point, he could have and should have asked, okay, what's going on here? Tell me about this woman. He doesn't do that. Instead, he just ramps up the intensities. I'm very uncomfortable using the F word in front of your honors. But he starts screaming expletives at Ms. Baca. Was it okay for him to draw his firearm? I don't know. Our expert is not – I don't know that that in itself creates a constitutional violation. The fact that it was also a – that this high-beam flashlight that's attached to his weapon probably didn't help with her confusion and her bewilderment. And that's something that we discussed below. I'm sorry. Did he have a duty to retreat? I don't – he could have. He certainly had that option. And I'm meeting into my rebuttal time here, but I do want to answer your question. He could – not necessarily a retreat, but he could have changed his position, particularly once Officer Fiero arrives, right? Who had a taser. Who had a taser. And Officer Appelzoller, who's just a few seconds behind Officer Fiero, about 15 or 20 seconds. If he was worried, as Officer Cosper said, that when she was coming out of the home, if he was worried about other people in the house, it's probably a good thing, right? If you want to draw her out, you have another officer there to assist. So in that sense, yes, Your Honor, he should have not necessarily retreated, but repositioned himself. And I know you're into your rebuttal time, but one last question, which is did you come across the case of Tenorio versus Pitzer in your research? And are you relying on that? No, Your Honor, I don't think that one's been cited in the briefs. Okay. Thank you. Good morning.  I'm Philomena Hausler from Robles, Rylan, and Anaya, and I'm here to represent the appellees. That includes, for purposes of the case, Officer Jared Cosper, the city of Las Cruces, and its former police chief, Dominguez. But for purposes of the order that's on appeal, that relates only to the decision on a motion for partial summary judgment by Officer Cosper, where he argued he was entitled to qualified immunity. So I'd just like to open by saying this, I think, is a classic totality of the circumstances case where an officer had to make a decision in a split second. And why I say that is the officer arrived in response to a call where family members had reported they were barricaded in the house, and... Barricaded in a bedroom. Barricaded in a bedroom. Meaning safe from her. Safe from her, although there was a transmission by dispatch before the officer arrived that indicated there was another child who was not in the room with the mother. And where she was in the house was not known by the mother. That's in the record, huh? That's in the record, yes. And so that's one of the things the officer heard right before he arrived, and as he turned onto the street and was parking, it's in the record that the last transmission he heard was that dispatch reported the line was no longer open. He received or he heard? He heard, I believe. So he, well, does he testify that he heard it? I know it's in the dispatch record. He does state he heard it. It only matters what he heard, right? Yeah. No, that's what he definitely said he heard, and it's backed up by the transmission record that the dispatch reported the line went cold. In other words, it was open line. The caller had stopped speaking and could only hear a child crying in the background. And that's concerning, and we bring that up in the brief because that could indicate what suddenly happened to the caller who had asked to stay on the line or the police coming and was reporting that she was very fearful of her mother who had threatened to kill her and had been acting out killing motions, stabbing motions with a knife. Toward the floor. Toward the floor. And as the officer approached, having that last piece of information in his mind about the call, the line being open at that point, he heard what sounds like to him a tinging sound. And that is captured on his body-worn camera video as he enters the patio and gets close to walking up onto the sort of enclosed, semi-enclosed porch area of the house. But this entire encounter took 40 seconds. Now, that's concerning. It's short. And it ended in the death of the suspect. And she was an older woman, and there does seem to be evidence that he was at least advised after she appeared in the doorway with knives that she had a mental issue. I think we note on footnote 8 of… Well before he shot her, right? Well before he shot her. But at any rate, it was a 40-second encounter. But in the last five seconds of that 40-second encounter, it can only be described as a tense, rapidly evolving situation. In fact, if you back up three seconds from that, within the last eight seconds, the suspect changes her posture, demeanor, and position twice in totally opposite ways. So she's getting commands screamed at her and lots of F-bombs, which she may not be accompanied to or accustomed to. So the heightened… any sort of a reaction from her, I would expect that there would be some. And when you say things changed and look how the temperature rose, she's almost sleepwalking is what I see. I don't see someone who has raised the knife. I don't see someone who… What I see is someone who's having difficulty processing information and dealing with an unexpected situation, directly contrary to what Officer Kasper saw when he peeked through the doorway, which is she's talking calmly with two women. Well, respectfully, Your Honor… Who are within two feet of her. And obviously, there's no concern about knife play. Respectfully, the record doesn't show that he peeked through the doorway. When he first looked through the doorway then. He came around the corner. He looks into the room where the woman is speaking very calmly with two adults. And that's the video. That's the video, and it's mounted right here. So think of it as a GoPro. You can see what he's seeing. Who was endangered when the officer shot her? The officer believed he was in danger. He did? Yes, he did. You've looked at the video? I've looked at the video. This little old lady holding two knives down, looking confused. You know, I'm not a young, vigorous guy. I wouldn't have been afraid of her. I could have dealt with it. Well… And the officer, it's just amazing to me that if he were rational, that he would think he was in danger from her. Well, Your Honor, that's certainly the plaintiff's argument. The district court did not find that through a careful analysis of all the Larson factors. Sometimes there's a problem with those. I'm not a fan of all these factors. They complicate the issue. Just look at what was going on there. Was she a threat to the officer? And those factors don't account for the fact that she's a little old lady who looks confused, who's holding the knives down. That's not one of the factors. Well, Your Honor, I would dispute the fact that she looks confused. That's one… I guess people can view the video and take from it whether she looks confused or she appears to be understanding his commands. I disagree, but forget that.  That little old lady holding those knives down was not a danger to a large officer who's probably got some sort of S. I don't care about that, really. But she wasn't doing anything so she was going to attack him and stab him or anything like that. Well, the question is, if the officer was mistaken about her intent, was his mistake a reasonable one? And if so, he's entitled to qualified immunity. And the court found it was a reasonable one. After analyzing all those factors… He certainly didn't sound reasonable. He's hollering… Well, for 40 seconds, the court found he ordered her 16 times to drop the weapon. And even the plaintiff admits in the opening brief, it appeared that she mouthed the words, no. And she was shaking her head and she… Could she have been saying, no, I don't understand? It does not appear to be that way from the video. And the question is, even if the officer was mistaken about that, could a reasonable officer have believed that she was saying no when she's shaking her head, shaking the knives up and down? Now, there you go with the gesture, both hands. And my understanding is that both knives are in one hand. Both knives initially were in separate hands when she appeared. Yes, initially. But now you're talking about her response. And by that time, the knives were in one hand. No, she moved the knives to one hand. Before she was shot. Before she was shot, but about 20 seconds into the encounter, maybe a little bit more, when this is the first change that I mentioned in her behavior. And does that make her more dangerous to have two knives in one hand? Or does that mean that it would be virtually impossible for her to… Well, the point is, I guess you could say most people are right-handed, so she moved them both into her right hand. But the point I'm getting at is at that point when she transferred them, this change in behavior, she stepped back, stretched the arm that had the hand that had the two knives in it now, stretched it out over the sofa and out of view, and then made what can only be described as a faint sort of motion in that suggesting to the officer, lower your gun. And she didn't make any comment, and her demeanor seemed calm. The officer testified he thought at that point that she was possibly going to comply and said, or ordered her again, put the knives down now. Then, this is the last five seconds, she changes her demeanor, stance, position again, brings both the arm down into view, rocks back and takes off and closes three feet of the distance that was between them for the entire encounter, which was about ten feet. You're talking like she is lunging at the officer. I didn't say lunging. And there's nothing like that on the video. We didn't say? Well, lunging I would understand. If even an old lady, maybe with two knives in a hand, which doesn't sound like the best way to do it, were to lunge at the officer, I hear you. But what we're talking about is commands, orders, loud language, foul language. And a woman who you can say she looks like she's ready for the Mensa exam, she looks to me like someone who's disoriented, and she takes two small steps and she's dead. Well, Your Honor, again, this was very similar to a state of Taylor case where there's an unprovoked change in the position of the suspect in these last seconds. And that was not provoked by the officer. There the person could be drawing a gun. That was the concern. And it was not an old 71-year-old lady. It was a young male who was disobeying the cops walking away from them. And the concern was, we're going to get shot. There was an immediate harm that's not in play here. Well, the court did believe it was an immediate threat based on the officer's testimony. And the totality of all the circumstances, including one mentioned before, he's not, you know, he's wearing a vest. He wasn't wearing a stab-proof vest. Have you read Tenorio v. Pitzer? Yes, I believe we cited it in our brief. If so, I don't remember that. But what about that case? It's you have someone walking across a room and is disobeying, and not an old lady, by the way, and someone who's actually made threats, and walking across a room who refuses to drop a knife in a hand and is shot and no qualified immunity. Well, I believe it's very different, and we distinguish the facts of our brief. Which I think that the case in Tenorio is much stronger for qualified immunity than this one. Tell me why you think differently. Well, the case in Tenorio, the officers actually walked into the person's house. He was leaving. I don't believe there was any evidence that he had time to comply with the order. It wasn't clear that he had time to comply with the order to drop the knife. He came much further than this woman did. He came out of the kitchen and across the living room. So he had plenty of time. But in this case, the officer never changed his position, had no real option to retreat. He was in a semi-closed area. Why do you say that? That's an important factor for me, if the officer had no option to retreat. And that was an issue in Tenorio, is that it was jammed up in the doorway. But here, we see that he came down a hallway, looked, I won't say peeked, looked into the kitchen. And the other officer had taken the woman out toward the driveway, I assume. So there's a good six, eight feet of unobstructed space there that he could back up into. I'm sorry, Your Honor, that is not correct. The officer never stepped into the house. He never peeked into the kitchen. The kitchen is not in view from where he was. Well, wherever the woman was standing. Was she not standing in the kitchen? She was standing a few feet back from the threshold of the doorway initially. And at the time he shot, she closed that distance and had her left foot on the open threshold of the doorway, approximately six feet away from the officer. You're saying she reached the threshold? Yes. Well, I guess we'll just watch the video. And it's an open threshold. The first bystander who exited opened the door, which was a screen door that was closed when the officer arrived. So he couldn't fully see the figures, only could see what appeared to be the shadow of two figures peeking inside. And that first woman who exited opened the screen door fully against the side of the house so that the officer could see past the screen door. But into the living room opposite directly where he was standing, which was with his back up against the wall in that semi-enclosed entryway. And the court discussed the layout of the area where he was at length. And those facts were not really disputed by the plaintiff. So, again, I mean, plaintiff interprets the video as you have been arguing and as Judge Hartz has been asserting. Video seems to show that this was a confused older woman. But the court did the careful analysis of all those factors and found, true, and the officer did not dispute this, that she did not technically make a hostile motion with the knife. She didn't raise it up, Anthony, you know, in the classic psycho movie style overhead as though to make an overhead stabbing motion. She didn't lunge, but she was armed with two knives. And that change in her demeanor in the last couple of seconds and she closed the gap. It's important to recognize this officer never moved from where he was when he announced his presence, stepped back, and motioned the two bystanders out. All he did was raise the gun when Ms. Baca appeared at the door, knife in hand, and given the information he had about the situation inside the house. And her appearing like that, that was not unreasonable. As you asked, what was the officer supposed to do? Back up, back up. It wasn't physically possible, the court found. I don't know why you say that. The video shows otherwise. We see down the hallway and there's nobody there. I don't think we can see down the hallway from that video. Where was the other officer and the two women standing? The two women were standing right at Officer Baca's side. Coming in, you can see their hands. You can hear them until Officer Fierro arrived, which was about, and it's in the briefs and in the court's order. It was about, I believe, 14 seconds before Officer Kasper fired at Ms. Baca. Officer Fierro was immediately occupied with trying to drag those women away. And he was with them a few steps away on the patio section. He was not on the upper step where Officer Kasper was, but he was within a few feet of that. And Officer Kasper testified that he could not retreat to that area and keep an eye on Ms. Baca, keep her within sight at the same time. And I think that's what went out by the video. I'll concede that point. I'll concede that he had plenty of room, but he thought he would lose sight of her. But I won't concede the point that he couldn't have backed up, which is what I thought you were saying. I don't see Tenorio cited in your brief. I believe it was cited, but I'll have to look it up. I think it's page 23 of appellant's appendix, page 034 on that appendix. Appellant's appendix? Oh, I thought you said it was in the brief. Well, that is not in our response brief, but it is in the brief below. Sorry. It is in the brief below. Okay. Well, thank you. You're welcome, Your Honor. Your time is long elapsed. Thank you. Thank you. You have three and a half minutes. That should be adequate. Thank you, Your Honor. Your Honors, to follow up on one point that was just discussed, at page 14 of the district court's opinion, the district court finds Baca did not make any hostile motions with the knives toward Cosper. Cosper admits that Baca did not raise the knives toward him in any kind of slicing, stabbing, or thrusting motion. And as Your Honors pointed out, that is what the video shows. She is very small, very feral. How do you account for the – you're a very good district judge in this case. I agree. How do you account for what you say is an error? What do you think happened? I have great respect for Judge Brack, and I certainly don't – I don't think I said anything very critical of him, and I certainly don't mean to be. But judges make errors all the time. That's why we have the courthouse here. We don't reverse that often, actually. Excuse me? We don't reverse that often, actually. They do very well. Well, I'm keeping my fingers crossed on this one, Your Honor. But I don't know why he made these findings. There are some other findings of fact he made in his opinion that touch on what's reasonable and unreasonable. These are questions of fact that should have been left to the jury. He even says in his opinion that on whether Cosper acted unreasonably was a close call. It should be left to the jury on reasonableness. Even if this court doesn't find that the violation here is clearly established as of April 2022, the court can and should still find that a reasonable jury could find that what Officer Cosper did here was unreasonable. And that's the other second part of the appeal here that I didn't really get to touch on when I was up here earlier. You know, qualified immunity gives a lot of leeway to officers, as it should, because they often find themselves walking into very chaotic situations. But this is not one of those. Officer Cosper did not walk into a chaotic situation. He walked into a calm, peaceful, quiet situation that had been resolved by these two women. The first thing he did was tell them to leave, and then he created the chaos. Officer Cosper is the one that created this scene that you see on the video. Your Honor, I stand for any questions, but I have nothing else to add at this point. Thank you, Counselor. Thank you. The case is submitted. Counselor excused. Thank you. Should we take one more? Sure. One more. Thank you.